AO 106 (Rev. 04/10) Application for a Search Warrant



SEALED

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia



CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

MAY 04 2017

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
    ) Case No. 5:17mj14
INFORMATION ASSOCIATED WITH EMAIL ADDRESS )
STORED AT PREMISES CONTROLLED BY )
PERFECTPRIVACY.COM )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A.

located in the ___Middle___ District of ___Florida___, there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
   ☑ evidence of a crime;
   ☐ contraband, fruits of crime, or other items illegally possessed;
   ☐ property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1341 | MAIL FRAUD |
| 18 U.S.C. 1343 | WIRE FRAUD |
| 18 U.S.C. 1349 | CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT.

   ☐ Continued on the attached sheet.
   ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Received by reliable electronic means and sworn and attested to by telephone.
~~Sworn to before me and signed in my presence.~~

/s/ Burt B. Foster, Jr.
*Applicant's signature*

Burt B. Foster, Jr.
*Printed name and title*

Date: 5/4/17

City and state: Charlottesville, VA

/s/ Joel C. Hoppe
*Judge's signature*

Honorable Joel C. Hoppe
*Printed name and title*



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH SALES@VACATIONPROPERTIESBYOWNER.NET THAT IS STORED AT PREMISES CONTROLLED BY PERFECTPRIVACY.COM | Case No. 5:17mj14 <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Burt B. Foster, Jr., a Postal Inspector with the United States Postal Inspection Service, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with the following account – sales@vactionpropertiesbyowner.net -- that is stored at premises controlled by **PerfectPrivacy.com**, an email provider headquartered at 12808 GRAN BAY PARKWAY, WEST, JACKSONVILLE, FL 32258 (the "SUBJECT ACCOUNT"). The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require **PerfectPrivacy.com** to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I have been a Postal Inspector with the United States Postal Inspection Service ("USPIS") since March 2001. I have conducted a variety of criminal investigations including

mail theft, mail fraud, identity theft, assaults, robberies, burglaries, financial crimes, and computer crimes. I am currently assigned to a Mail Fraud/Revenue Investigations team located in Northern Virginia where my primary assignment is to investigate the defrauding of U.S. citizens and the United States Postal Service. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. I have specialized training and experience in investigations involving corporate fraud and financial crimes. Among other things, I have conducted numerous searches and interviews, gathered documents through grand jury investigations and voluntary productions, and conducted physical and electronic surveillance. During my career, I have participated in a number of investigations involving businesses or business people suspected of engaging in fraud-related schemes, including embezzlement, misappropriation, theft, and conversion of corporate funds.

3. The information in this affidavit is based on my investigation, my training, knowledge, and experience, and through information that has been related to me through data, reports and other officers or agents involved in this investigation and related subject area. Because this affidavit is being made for the limited purpose of securing a search warrant, I have not included each and every fact known to me.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail fraud and/or wire fraud) have been committed by Michael Dean KENT ("KENT") and others known and unknown. There is also probable cause to search the information described in Attachment A for evidence, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is empowered to act under the authority of "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. The United States, including the USPIS, is investigating possible violations of the mail fraud and wire fraud statutes. From in or around 2014 to in or around April 2017, there is probable cause to believe KENT used and/or caused to be used the U.S. Postal Service, telephone contacts, and electronic communications to induce individuals ("VICTIMS") to sign contracts to sell their partial interests in certain real estate properties, commonly known as timeshares ("TIMESHARES"). KENT conspired with others, known and unknown, to convince VICTIMS to sign contracts and send currency, via the U.S. mail for the purpose of defrauding the VICTIMS. KENT and his coconspirators targeted hundreds of VICTIMS in more than a dozen states in the U.S. and Canada. Typically, each VICTIM paid KENT between $500 and $1,500.

7. KENT and his coconspirators represented themselves to be representatives of at least two different companies, including The Holiday Property Group LLC ("HPG") and Vacation Properties by Owners LLC ("VPO"). KENT and his coconspirators used different company names at different times. After there were numerous complaints received by outside consumer protection non-profit organizations, such as the Better Business Bureau, KENT closed down HPG, moved from Virginia to North Carolina, and started a new company named VPO.

that operated in the same way. KENT and his coconspirators represented that both HPG and VPO facilitated the transfer of TIMESHARES between buyers and sellers.

The Holiday Property Group LLC

8. HPG was active between approximately 2014 and 2016. KENT's name appeared as "Michael Dean Kent" on email correspondence from HPG.

9. Bank records show that during the time period HPG was active, the bank account belonging to HPG were "linked" to a personal debit card account held in KENT's name and opened using his personal identifiers. "Linked" accounts are those that involve multiple accounts under the same user/customer profile for the bank, allowing for ease of transferring funds electronically between accounts belonging to the same user/customer. Linked accounts are generally owned and operated by the same business or individual.

10. The VICTIMS owned interests in TIMESHARES that they intended to sell. KENT and/or his coconspirators represented that HPG had located a cash buyer for the VICTIMS' TIMESHARES. KENT's coconspirators posed as the buyers, who communicated independently with some of the VICTIMS by email and phone. The VICTIMS used the U.S. mail to send sales contracts, sales-associated records, and payments, often in the form of checks, to HPG. KENT and/or his coconspirators represented that the payments would be used to cover a portion of the buyer's costs at closing (the date when the sales transaction was consummated) or to pay "transfer fees" assessed by the timeshare resort management company. KENT and/or his coconspirators asked the VICTIMS to send a specified amount in advance of closing, indicated that the money would be kept in escrow, and told VICTIMS that their payment would be disbursed only upon the completion of the sale of the TIMESHARE. KENT and/or his

4

coconspirators represented that the VICTIMS could receive a refund of those payments at their request, provided the request was made before closing.

11. Once the payment was remitted and the check was cashed, KENT and/or his coconspirators often told the VICTIMS that the buyer of their TIMESHARE was having a hard time coming up with additional funds for closing. KENT and/or his coconspirators asked the VICTIMS to assist the buyers financially. In those instances VICTIMS sent a second additional check to KENT and his coconspirators. After cashing the second check, KENT and/or his coconspirators often informed the VICTIMS that either the buyer, or KENT, posing as the facilitator of the sale transaction, had an unexpected family emergency that prevented them from going through with the sale of the TIMESHARE on the previously arranged closing date. At that point, all communication from KENT and/or his conspirators with the VICTIMS typically ceased. The VICTIMS usually attempted to contact KENT and/or his coconspirator on multiple occasions, by email and/or by phone, to demand a refund of their monies, but those attempts were unsuccessful. The TIMESHARES were never sold and refunds were never made to any of the known VICTIMS.[1]

12. In or around October 2016, those VICTIMS that had been dealing with HPG began receiving notification that all their emails were rejected because the server could not be found. At this time, persons who placed calls to phone numbers provided for HPG and KENT received a message that the phone numbers had been disconnected.

---

[1] After VICTIMS could no longer successfully contact anyone affiliated with HPG or the buyer, many began contacting the Virginia Office of the Attorney General, the Better Business Bureau, the Frederick County, Virginia, Sheriff's Office, the Virginia Real Estate Board, and the counterparts for those agencies in other states to lodge complaints about KENT, his coconspirators, and HPG. Hundreds of potential victims of KENT's fraud scheme were identified through these complaints and through Wells Fargo bank records.

13. Law enforcement obtained copies of contracts between HPG and several VICTIMS for the sale of their TIMESHARES. These contracts indicated that either "HPG, 526 South Broadway, Baltimore, Maryland 21232" or "HPG 18585 Coastal Highway, Unit: 10, Suite: 103, Rehoboth Beach, Delaware 19971" was the "seller" of their TIMESHARE. The contract generally included a sales price and a statement that the VICTIM was to place a payment into an escrow account held by HPG to complete the sale.

14. KENT and/or his coconspirators instructed some VICTIMS to use DocuSign to sign their contracts with HPG. DocuSign was a company that operates an internet-based system allowing individuals to electronically sign documents uploaded by one user and shared with another. Bank records for HPG indicated several recurring payments to DocuSign during the relevant time period.

15. The listed mailing address for HPG changed during the conspiracy. In or around June 2014, KENT listed HPG's mailing address as a commercial mail receiving center located in Rehoboth Beach, Delaware (18585 Coastal Highway, Unit 10, Rehoboth Beach, DE 19971). Although bank statements for the Wells Fargo HPG account were sent to that same Delaware address, KENT and his coconspirators instructed the VICTIMS in 2015 and 2016 who were dealing with HPG at that time to send all payments and correspondence to the address located at 206 Doe Trail, Winchester, VA 22602. VICTIMS indicated that, regardless of HPG's Maryland or Delaware addresses, they were instructed to send their correspondence to an address located at 206 Doe Trail, Winchester, VA 22602, which corresponds to a residence located within Frederick County, Virginia.

16. KENT and his co-conspirators used email accounts in furtherance of the fraudulent scheme. Most of the VICTIMS' communications with HPG occurred through email

6

to "Michael Kent" or "Michael Dean," directed to the email address "mdeanfinancedivision@theholidaypropertygroup.net". The signature line on correspondence from that email address was:

> Michael Dean
> The Holiday Property Group LLC
> Winchester Virginia Office: 540-877-1166
> Winchester Virginia Direct Line: 540-877-1134

17. In addition, VICTIMS corresponded with HPG through email to the following Subject Account email addresses: mdeanfinancialdivison@theholidaypropertygroup.net, mdkent@theholidaypropertygroup.net, and customerservice@theholidaypropertygroup.net. Some known VICTIMS communicated repeatedly with HPG using these email accounts about purported efforts made to sell the VICTIMS' TIMESHARES.

18. These same VICTIMS provided copies of checks they sent to HPG. Bank records show that these checks were deposited into the same Wells Fargo Bank account associated with HPG and linked to KENT's personal bank account.

19. Based on a comparison of the contracts, e-mail communications, and statements of the VICTIMS, KENT and/or his coconspirators used the same identifying information for the purported "buyers" in several different transactions simultaneously. For example, one or two "buyers" would be in the process of buying interests in 5 to 10 TIMESHARES, owned by 5 to 10 different VICTIMS, each contracted for sale in excess of $16,000, at the exact same time. VICTIMS also provided phone numbers given to them by KENT and/or his coconspirators, so they could contact the buyers of their TIMESHARE. KENT and/or his coconspirators gave the same phone numbers to multiple VICTIMS. These phone numbers are assigned to various cell

7

phones serviced by various cell phone providers. Bank records show payments from HPG's checking account to Straight Talk wireless and Verizon wireless for multiple phone accounts.

20. On or about December 15, 2016, investigators with the OAG and Frederick County, VA Sheriff's Office interviewed Diane Bishop ("BISHOP"), the legal owner of 206 Doe Trail, Winchester, VA 22602. BISHOP informed investigators she rented the residence at 206 Doe Trail to KENT.[2] BISHOP indicated she knew KENT was operating a business known as HPG from the residence at 206 Doe Trail. BISHOP stated KENT abandoned the property at 206 Doe Trail on or about October 15, 2016.

21. BISHOP indicated KENT's business was a timeshare resale business, and that KENT had employed BISHOP's sister and other family members of BISHOP to work for him in that business. She did not know the nature of their employment with him. Review of the bank records from HPG indicated checks payable to at least one relative of BISHOP. In the memo line on several of these checks were names that matched to known VICTIMS of the scheme.

22. BISHOP further stated she would often make deposits at Wells Fargo bank at KENT's request into accounts controlled by KENT. She indicated these deposits consisted of checks from individuals who were in the process of selling TIMESHARES and paid KENT money for the closing of their sale.

23. Bank records show that a majority of the checks issued from HPG's Wells Fargo bank account were for the 206 Doe Trail residence, either to BISHOP for rental payments or to CFQ Services to provide residential services, including electricity and internet. In addition, a

---

[2] BISHOP provided a description of KENT and identified KENT from his driver's license photo. BISHOP also identified KENT's vehicles as a tan or gold Cadillac Escalade and silver Mercedes Benz.

majority of the withdrawal transactions in the linked bank accounts during the 2015 and 2016 time period were through KENT's personal debit card and occurred within Frederick County, Virginia. Specifically, those transactions included the Virginia Department of Alcoholic Beverage Control, which operates liquor stores within the Commonwealth of Virginia; Toms Market, a small, local convenience store located near 206 Doe Trail; Wal-Mart, a national retail store that sells items ranging from clothing and shoes to electronics and groceries; Martins, a local grocery store in Frederick County, Virginia; and Amazon.com, an online retail store. There were also checks from the linked accounts made payable to at least one relative of BISHOP and one or two other unknown individuals. However, there were no payments made to any identifiable timeshare resort management companies, mortgage companies, title agencies, closing attorneys, or any other entities that would be reasonably related to the legitimate sale or transfer of TIMESHARES.

Vacation Properties by Owners LLC

24. VPO appears to have started operation in 2016 and continued to be active as of in or around mid-April 2017.

25. As of October 2016, bank and vehicle records indicate that after KENT shut down HPG and, as he was starting up VPO, he moved to 8 Old Printers Way, Franklin, NC 28734-7841.[3]

---

[3] From October 2016 through January 2017, Wells Fargo mailed bank statements for HPG to an address at 8 Old Printers Way, Franklin, NC 28734-7841. A review of transactions during this time frame also indicated debit card transactions for the HPG account were conducted in person in Franklin, North Carolina. Law enforcement was able to locate the residence of 8 Old Printers Way, Franklin, NC 28734, within Macon County, North Carolina.

26. Bank records show that the bank account belonging to VPO was linked both to HPG group and to the personal debit card account held in KENT's name. From November 2016 to February 2017, the bank account for HPG was receiving and sending debits and credits to the bank account for VPO.

27. The VPO scheme followed the same pattern as the HPG scheme. KENT and/or his coconspirators contacted VICTIMS who wanted to sell their TIMESHARES and represented that the VPO had located a cash buyer for their TIMESHARE. KENT communicated with at least one VICTIM with a new email address (the SUBJECT ACCOUNT) not associated with the HGP email addresses. Coconspirators posed as the buyers and communicated independently with the VICTIMS. KENT and/or his coconspirators represented that payments were needed to cover a portion of the buyer's closing costs or associated fees and asked the VICTIMS to send a specified refundable amount in advance of closing on the transaction to be held in escrow until the completion of the TIMESHARE sale. To date, no VICTIMS of the VPO scheme have completed sales of their TIMESHARES or have received refunds.

28. In or around September 2016 and early in October 2016, as KENT was winding up HPG and converting to VPO, law enforcement discovered a check that had been deposited into a Wells Fargo HPG bank account. Upon inspection, law enforcement discovered that the check was in fact written to VPO. Law enforcement subsequently made contact with the VICTIM who issued the check ("VICTIM 1").

29. KENT and/or his coconspirators used the SUBJECT ACCOUNT in furtherance of the fraudulent scheme. Victim 1 advised that she/he was communicating with an individual who

had identified himself as Michael Scott with VPO.[4] In addition, Victim 1 provided law enforcement with emails she/he had received from "SCOTT" using the SUBJECT ACCOUNT, listing contact information in the signature block, as follows:

> Michael T. Scott: GRI, CDPE
> Direct Line: 717-212-9130
> Blackberry: 717-654-3251
> Vacation Properties By Owner
> 644 Shrewsbury Commons Ave
> Shrewsbury, PA 17361

Specifically, Victim 1 communicated with "Michael T. Scott" through the SUBJECT ACCOUNT about the purchase and transfer of the TIMESHARE.

30. Law enforcement has established that the SUBJECT ACCOUNT is maintained by the email provider **PerfectPrivacy.com**. In general, an email that is sent to a **PerfectPrivacy.com** subscriber is stored in the subscriber's "mail box" on **PerfectPrivacy.com** servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on **PerfectPrivacy.com** servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on **PerfectPrivacy.com's** servers for a certain period of time.

## BACKGROUND CONCERNING EMAIL

31. In my training and experience, I have learned that **PerfectPrivacy.com** provides a variety of on-line services, including electronic mail ("email") access, to the public. **PerfectPrivacy.com** allows subscribers to obtain email accounts at the domain name

---

[4] Law enforcement reviewed bank records from both HPG and VPO and determined that statements for both were being sent to the same 8 Old Printers Way address in Franklin NC. In addition, the signature cards for both sets of accounts (HPG and VPO) listed the sole account signatory as KENT.

11

PerfectPrivacy.com, like the email account listed in Attachment A. Subscribers obtain an account by registering with **PerfectPrivacy.com**. During the registration process, **PerfectPrivacy.com** asks subscribers to provide basic personal information. Therefore, the computers of **PerfectPrivacy.com** are likely to contain stored electronic communications (including retrieved and unretrieved email for **PerfectPrivacy.com** subscribers) and information concerning subscribers and their use of **PerfectPrivacy.com** services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

32. A **PerfectPrivacy.com** subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by **PerfectPrivacy.com.** In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

33. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I

know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

34. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

35. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

36. This application seeks a warrant to search all responsive records and information related to the SUBJECT ACCOUNT under the control of **PerfectPrivacy.com**, a provider

subject to the jurisdiction of this court, regardless of where **PerfectPrivacy.com** has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the SUBJECT ACCOUNT if such communication, record, or other information is within **PerfectPrivacy.com's** possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.[5]

37. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed

---

[5] It is possible that **PerfectPrivacy.com** stores some portion of the information sought outside of the United States. In Microsoft Corp. v. United States, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information—including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of **PerfectPrivacy.com.** The government also seeks the disclosure of the physical location or locations where the information is stored.

14

or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

38. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on **PerfectPrivacy.com**, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

**/s/Burt B. Foster, Jr.**
Burt B. Foster, Jr.
U.S. Postal Inspector
U.S. Postal Inspection Service

Received by reliable electronic
means and sworn and attested to
by telephone on May 4, 2017.

~~Subscribed and sworn to before me on~~ xxxxxxxxxxxxxxxxxxxxxxxxx, ~~2017~~

_____
Honorable Joel C. Hoppe
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the following SUBJECT ACCCOUNT:

**SALES@VACATIONPROPERTIESBYOWNER.NET**

that is stored at premises owned, maintained, controlled, or operated by **PerfectPrivacy.com**, a company headquartered at 12808 GRAN BAY PARKWAY, WEST, JACKSONVILLE, FL, 32258.

# ATTACHMENT B

## Particular Things to be Seized

**I.    Information to be disclosed by PerfectPrivacy.com (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for the SUBJECT ACCOUNT:

   a.   The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

   b.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

   c.   The types of service utilized;

   d.   All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

   e.   All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

f.  For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within **10 DAYS** of the issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail fraud and/or wire fraud) have been committed by Michael Dean KENT and others, known and unknown, occurring from in or around 2014 to in or around April 2017, including, for the SUBJECT ACCOUNT, information pertaining to the following matters:

(a) Evidence indicating KENT's contact with victims, including communications regarding the sale, resale or transfer of timeshare properties, financial transactions relating to timeshares, and communications with coconspirators regarding the sale, resale or transfer of timeshare properties;

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).